[Cite as *Kirn v. Heifner*, 2014-Ohio-535.]

IN THE COURT OF APPEALS FOR GREENE COUNTY, OHIO

KATHRYN KIRN                    :

    Plaintiff-Appellant            :            C.A. CASE NO.    2013 CA 44

v.                              :            T.C. NO.    13CVI500

BRIAN HEIFNER                   :            (Civil appeal from
                                             Municipal Court)
    Defendant-Appellee             :

                                :

. . . . . . . . . .

# **O P I N I O N**

Rendered on the    14th    day of     February    , 2014.

. . . . . . . . . .

KATHRYN KIRN, 241 S. Dawson Avenue, Columbus, Ohio 43209
    Plaintiff-Appellant

BRIAN HEIFNER, 4770 Old Rt. 35 East, Jamestown, Ohio 45335
    Defendant-Appellee

. . . . . . . . . .

DONOVAN, J.

    **{¶ 1}** This matter is before the Court on the pro se Notice of Appeal of

Kathryn

Kirn, filed August 14, 2013. Kirn appeals from the July 17, 2013 decision of the Xenia Municipal Court in favor of Brian Heifner on Kirn's Small Claims Complaint. We hereby affirm the decision of the trial court.

{¶ 2} Kirn's complaint provides that "B. Heifner installed propane / heat pump furance (sic) 12/3/12. At 4864 OLS (sic) U.S. 35 E but heat pump didn't work * * * See attached small claim information sheet." The information sheet provides that Kirn sought $953.00 plus interest, and it provides: "B. Heifner installed propane heat pump furnace 12/3/12 at 4864 old U.S. 35 East but heat pump didn't work. Brian returned several times but was unable to find problem. Finally had to call Lowes HVAC. 2 men worked 3 hours ($370.) Fan stayed on continually so Lowes returned for 1 hour ($140). Heat pump went out again. So Rheem installer came from Dayton. Found too small a wire used which overheated and blew (2) time delay fuses. Replaced for $192.70. Heifner added $400 later to bill for $100 thermostat. Bill paid thinking installation completed, but wasn't."

{¶ 3} A trial was held on July 16, 2013. Kirn testified that Heifner installed a furnace and heat pump at her rental property, and that she paid him on December 3, 2012. She stated that she "chose the heat pump because it takes the heat from the air, it's less expensive; and then after thirty degrees, there's no more heat left in the air. So as a backup, we discussed another oil or propane [furnace]. * * * we went to propane for this second furnace. So it's heat pump down to thirty degrees, then propane from there on down in cold weather." Kirn stated that her renters advised her in February that the "propane was on but the heat pump, which should be on, was not. The day I was there, it was forty-three degrees and the propane was on." She stated that "Brian had come several times but couldn't fix it." She testified that the "heat pump never did get installed properly." Kirn stated that she

told her tenants to contact Heifner, and that they "said he'd been back several times, couldn't figure the problem." Kirn stated that she phoned Heifner Heating and Cooling and "said I wanted a different person to come out and look at the installation. She said, well, Brian did this on his own, we are not backing it up."

{¶ 4}    Kirn stated that she contacted "Lowe's brothers, Lowe's HVAC," and that "two men worked three hours." She stated that the men "changed from twenty-five degrees on the heat pump back to what is called for in the manual at thirty degrees, because there's no heat in the air under thirty degrees." Kirn stated that the temperature at the time "was under thirty degrees so they couldn't tell if the heat pump was going to work after they checked everything." Kirn stated that the pump "didn't work when it warmed up," and that the men from Lowes came back and determined that the "blower was running full-time. They corrected that. They checked the Freon. They checked it out as much as they could." According to Kirn, the heat pump "still wasn't working. It had never been installed to where it was working properly."

{¶ 5}    Kirn stated that she "called a third person named Patrick who installs Rheems in Dayton. He came out and he found that the heat pump had a wire - - one of the two wires was too small. And he used the word this bigger one is a thirty-five, the smaller one's only a thirty; it's overheating, throwing the two breakers. And he said that's been your problem the whole time."

{¶ 6}    Kirn asserted that "the first tank of propane had a leaky valve and [the renters] lost a lot of propane and the dealer supposedly compensated them. I think he undercompensated." She stated that the renters "sneaked out owing me January, February,

March, April's rent. They couldn't pay their bills."

{¶ 7} Kirn submitted two bills from "Lowe's HVAC," one of which is dated March 7, 2013, in the amount of $140.00, and provides, "Checked refrigerant charge, adjusted charge and tstat," and indicates a charge of $70.00 for labor and $70.00 for a service call, and another which indicates it was paid on March 5, 2013, in the amount of $370.00, and provides, "rewired control wiring on heat pump and LP gas furnace. Set thermostat for dual fuel and heat pump," and indicates a charge of $300 for three hours of labor by two men, and a $70.00 service call charge. Kirn also submitted "Dale's Bill," dated May, 2013, which contains multiple unrelated charges but includes a highlighted charge of $80.00 for "heat pump re-wire-extra," and Kirn stated that it was from Dale Peckham "for installing the wire" for the heat pump. Kirn stated that the system has worked since Dale Peckham installed the new wire. Finally, Kirn submitted a receipt, dated April 12, 2013, from "Lowe's Home Centers, Inc.," in the amount of $112.70, "to buy the new breakers and the wire."

{¶ 8} Kirn asserted that "Lowe's told me that * * * I was really overcharged for the thermostat and kit * * *. So I got on the internet this week and first thing under the Honeywell, they gave FocusPRO thermostats, no need for external kits, no need for wires, reduces the backup heat needed." Kirn stated that she "found one on line for a hundred and eighty five dollars plus eleven to ship it. So it was two hundred. * * * ." The following exchange occurred:

MS. KIRN: And I had also asked - -said that he had overcharged on the thermostat according to Lowe's.

THE COURT: Well, I don't have anything from Lowe's that tells me that, do I?

MS. KIRN. No. That was personal, yes.

THE COURT: And I'm not going to take anything off the internet.

MS. KIRN. Okay. All I've got is the cost of the Honeywell, three copies of it. I don't know if she wants these or not.

THE COURT: * * * That's total of seven hundred and two dollars. * * * What do you have that you don't know if I want?

MS. KIRN: Lowe's said I was terribly overcharged so I got what it - - the thermostat, the Honeywell recommended thermostat.

THE COURT: Off the internet?

MS. KIRN: Off the internet.

THE COURT: I don't want those.

{¶ 9}    The following exchange occurred in the course of Heifner's testimony:

MR. HEIFNER: * * * Ma'am, on the thing of the thermostat, she got the cost of the thermostat, not of running the twenty-five feet of two different types of wire, the modem to make a fossil fuel, dual fuel, where you have a heat pump and a propane furnace running together because usually it's an electric furnace. Well, when you run a fuel, they cannot run together at the same time so you have to buy a fossil fuel kit which is what it's called. And it alone is over a hundred dollars just for the module.

THE COURT: So you're saying that the four hundred dollars that you charged her was - -

MR. HEIFNER: For the installation - -

THE COURT: For the thermostat - -

MR. HEIFNER:  - - of the thermostat, the thermostat, the module, and the outdoor sensor.

{¶ 10}  Heifner stated that when he "got the job done, there was a lot of gas, propane usage.  He called me * * * and told me the gas was using too much after three weeks - -  after it was done and working * * * ."  The following exchange occurred:

MR. HEIFNER:  And [the tenant] told me how much gas he was using. And I said that's not right, that's too much.  So I went over there, and I checked bubbles on all the fittings.  I couldn't find any in the basement that I did because I ran all new gas line, pipe, black pipe.  So I proceeded  on the way outside and doing the propane company's work.  And I found out right at the shutoff valve on the tank itself that there was bubbles; there was a leak, pretty good leak.  So I told him; we called them, they came out and replaced a new tank and gave him some credit back. * * * I did that on my own.  I could have charged her for that because it wasn't my fault, but I did not charge her.  That was free.

Then I went back again and somehow the thermostat had gotten reset, maybe power outage or whatever.  It's a programmable.  So I had to go in there, reprogram it and get it back to where it was going to fossil fuel, using the outdoor sensor and all this stuff.  * * * I reset it, I put it back to the setting and everything went really - - was fine.  I called him a couple days later, he said it's running fine.

So she proceeded - - I sent her a bill after - - December 5, somewhere around there, that's when I was finished; and she paid it so it must have been - - I

don't understand it. * * * So but she finally sent me the check and that's the last I heard of it until she called me on a Tuesday. I had the flu last winter bad, all week long. * * * I called him on a Friday morning.

THE COURT: Him who?

MR. HEIFNER: Scott, who lives right next door. Because that's who I got to call to get in to have someone there so I have access to the thermostat and everything so I can run the system and see what's going on. So I called him Friday morning and he said he came home that night before, Thursday, and she had had Bobby Lowes there. She called me one time, Tuesday morning; and then she called someone else. She didn't give me a chance. And it says right there in the letter that he called me and I told him as soon as I can, I will. And she went with someone else and then all this stuff happened, it didn't work right after that. So that's - -that's all I've got.

{¶ 11} Heifner submitted a handwritten statement, dated, July 15, 2013 that appears to be signed by Scott Overturf, Kirn's tenant. It provides that Heifner installed a new furnace and that, "Yes there was bugs in the system, I called Brian whenever there was a problem with furnace he did come to house to fix problem. After about the fourth time the system was working fine. Then one day Kathern (sic) and I was outside of house and noticed that the heat pump and propane was on same time." The statement provides that Overturf called Heifner who "came out and noticed on Honeywell thermostat that there was a system reset happen it started working fine, then furnace messed up again I called Brian he said he had the flu and would be there as soon he felt better and in the meantime Kathern (sic) had Lowe's from Cedarville come

out to look at system." Overturf's statement provides that subsequently "the system was worse than before, then called Brian again he came out noticed the system was set wrong from Lowe's it was set for warmer climates. Brian Kathern (sic) and I was there and Brian told Kathern (sic) that the electric panel need updated so he was going to run a subpanel to run furnace. Also Brian lives next door approx. 1/8 mile away."

{¶ 12} At the conclusion of Heifner's testimony, Kirn referred to a letter from her addressed to Heifner, dated March 22, 2013, in which she stated that she requested that he pay her Lowe's bills. Kirn stated, "You had the propane set at twenty-five. This is five degrees below the point that a heat pump can extract heat from air. So it comes on as electric and it's very inefficient pulling it up. And Lowe's told me this. They set all the settings back at factory settings because this is not approved setting that he put things on. They never told me that he came back again and worked on anything." The letter was not admitted as an exhibit.

{¶ 13} The following exchange occurred:

THE COURT: Any way, go ahead and finish - - wrap it up.

MS. KIRN: * * * it was not working and there was a fault in a line that caused overheating and threw breakers.

THE COURT: But Lowe's didn't end up fixing it, did they?

MS. KIRN: * * * they thought they had.

THE COURT: They tried. So I'm not sure why you expect Mr. Heifner to pay for someone to come out and not fix your furnace.

MS. KIRN: They thought they had. They made corrections. They came out twice. And it's this third man who finally found the problem. But these two

men worked three hours. * * *

* * *

MS. KIRN: I called Lowe's because they said Brian couldn't fix it. And he was standing there, Scott was standing there saying look at this, the propane, you know, is on. And he said it's costing me a fortune, I can't afford it. And they knew I called Lowe's and they were there when Lowe's came.

{¶ 14} The trial court's decision merely provides that the court ruled in favor of Heifner, and we note that Kirn did not request in writing that the court issue written findings of fact and conclusions of law, pursuant to Civ. R. 52. We also note that the rules of evidence do not apply to proceedings in the small claims division of a municipal court. Evid.R. 101(C)(8).

{¶ 15} Kirn's brief does not comply with App.R. 16(A). She has failed to set forth specific assignments of error. Her brief provides in part that she "requests that the four service call/repair bills be paid by defendant, as well as court costs, and that he install the proper 2 stage / 1 stage cooling thermostat with proper outdoor sensor, if a sensor is needed with the particular dual heat stage / single cooling stage thermostat being installed." Attached to Kirn's brief are copies of the bills she submitted to the trial court, as well as product information regarding a Wireless FocusPRO Thermostat, model number TH811OU1003.

{¶ 16} We infer from Kirn's brief that she is asserting as an assignment of error that the judgment of the trial court is against the manifest weight of the evidence.

{¶ 17} As this Court recently noted:

The standard set forth for manifest-weight-of-the-evidence appellate review in *State v. Thompkins*, 78 Ohio St.3d 380, 678 N.E.2d 541 (1997), applies

also in civil cases. *Eastley v. Volkman*, 132 Ohio St.3d 328, 2012-Ohio-2179, 972 N.E.2d 517, ¶ 17. In applying this standard, the appellate court, reviewing the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the factfinder clearly lost its way and created such a manifest miscarriage of justice that the judgment must be reversed and a new trial ordered. The discretionary power to grant a new trial should be exercised only in the exceptional case in which the evidence weighs heavily against the judgment. *State v. Martin,* 20 Ohio App.3d 172, 175, 485 N.E.2d 717 (1st Dist.1983), cited approvingly in *Thompkins* at 387. *Folck v. Redman*, 2d Dist. Clark No. 2013-CA-35, 2013-Ohio-3646, ¶ 8.

{¶ 18} Regarding the two "Lowe's HVAC" bills, in the total amount of $510.00, as the trial court noted, it is clear that the heat pump was not successfully repaired by the "Lowe's HVAC" repairmen. Kirn testified that the repairmen "checked it out as much as they could," and that they "thought" they had fixed it, but it "still wasn't working." Heifner stated that after the system was working, and a problem arose when he was ill, Kirn "went with someone else and then all this stuff happened, it didn't work right after that." Scott Overturf's letter provides that "the system was worse than before" after the "Lowe's HVAC" repairmen were there. We conclude that the trial court's decision in favor of Heifner regarding the "Lowe's HVAC" bills is not against the manifest weight of the evidence.

{¶ 19} Regarding the $80.00 charge on "Dale's Bill," as well as the receipt from Lowe's Home Centers, Inc., in the amount of $112.70, both of which Kirn submitted as evidence of the

cost of replacing the wire that Kirn alleged was wrongly installed by Heifner, we note that the $370.00 "Lowe's HVAC" bill provides in part, "Rewired control wiring on heat pump and LP Gas Furnace." As noted above, according to Heifner and Overturf, the system did not work properly after two visits from "Lowe's HVAC." Kirn contacted "Patrick," who allegedly found the faulty wire, and Dale Peckham replaced the wire, after the "Lowe's HVAC" repairmen had rewired the heat pump. It is not clear which wire Peckham replaced, and given the intervening actions of "Lowe's HVAC," we cannot conclude that the trial court's decision in favor of Heifner regarding the costs of replacing the wire is against the manifest weight of the evidence.

{¶ 20} Finally, regarding the cost of the thermostat, we note that Heifner and Kirn provided conflicting testimony. Kirn asserted that "Lowe's" advised her that Heifner overcharged her, and that she found an adequate thermostat on the internet for two hundred dollars. We note that the trial court did not admit her exhibit regarding the thermostat, and the promotional information attached to her brief is not part of the record on appeal. App.R. 9. Heifner asserted that his charge of $400.00 did not just cover the cost of the thermostat but also its installation, including the cost of "running the twenty-five feet of two different types of wire," a modem that costs over $100.00, an outdoor sensor, and a fossil fuel kit. The trial court was free to credit Heifner's testimony over Kirn's, and we cannot conclude that the court lost its way in resolving the conflicting testimony regarding the cost of the thermostat.

{¶ 21} Having thoroughly reviewed the entire record, we conclude that the decision of the trial court in favor of Heifner is not against the manifest weight of the evidence. The judgment of the trial court is affirmed.

. . . . . . . . . .

[Cite as *Kirn v. Heifner*, 2014-Ohio-535.]
HALL, J. and WELBAUM, J., concur.


Copies mailed to:

Kathryn Kirn
Brian Heifner
Hon. Catherine M. Barber,
Acting Judge